# IN THE(TUNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JACINDA D. PERRY,** | : | **Civil No. 1:19-CV-1923** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW M. SAUL** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction[1]

Jacinda Perry filed for disability insurance benefits and Supplemental Security

Income benefits in April of 2014, alleging that she was disabled and could not work

due to degenerative disc disease, arthritis, diabetes, and neuropathy. Following a

hearing, her application for benefits was denied by an Administrative Law Judge

(ALJ) in January of 2016, but this decision was vacated by the district court and

remanded for further consideration by the ALJ. On remand, the ALJ held a second

---

[1] In Jacinda Perry's case we most assuredly do not writ upon a blank slate. Quite the contrary, Perry's case had been pending in administrative and legal proceedings over the past seven years and this is Perry's second Social Security appeal. During this span of time, an enormous administrative record of more than 4,600 pages has been complied. Thus, the instant case comes before us with a lengthy procedural and factual history, which we have endeavored to carefully consider.

hearing and, in 2019, determined that Perry was not disabled and could perform a range of light work with postural and environmental limitations.

Perry now appeals this decision, arguing that the ALJ erred in her evaluation of the medical evidence and the plaintiff's subjective complaints. Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Medical History</u>

Perry filed for disability benefits in April of 2014, and again in May of 2017,[2] alleging an amended onset date of disability of November 8, 2013. (Tr. 1630). She alleged disability due to depression, neuropathy in her hands and feet, type 2 diabetes, and arthritis in her back. (Tr. 1901). At the time of the ALJ's second decision, Perry was considered an individual closely approaching advanced age, had

---

[2] After the district court remanded this case to the ALJ, and before the ALJ held a second hearing, Perry had filed a second application for benefits. Thus, these applications were consolidated before the ALJ prior to the second hearing on May 9, 2019. (Tr. 1630).

a high school education, was able to communicate in English, and had past work as a home health aide. (Tr. 1645-46).

Notably, the medical and administrative record in this case is both expansive and highly equivocal. This record now spans some 4,600 pages. Moreover, as detailed below, this sweeping record spanning many years has a profoundly equivocal quality. Thus, for each entry which suggests that perry's impairments are disabling, there is often a contemporaneous and countervailing entry which indicates that she has the residual capacity to perform some work.

The record indicates that Perry was treated for pain in her lower back, knees, and hands and feet, as well as for diabetes and depression in the relevant time period. The record shows that in January of 2013, Perry was seeing a chiropractor for her lower back pain. (Tr. 249). Perry was also diagnosed with Type 2 diabetes in January 2014. (Tr. 3175). At a hospital visit for low blood sugar in March 2014, a physical exam showed normal inspection of the back and no tenderness, and normal motor strength in the upper and lower extremities. (Tr. 419). Treatment notes from May of 2014 note that Perry walked for exercise. (Tr. 488). In addition, it was noted that she was independent with her activities of daily living and that her current pain management was effective. (Tr. 504). Treatment notes from a hospital visit in May

2014 indicate that Perry was experiencing severe pain in her hands and feet, and that her blood glucose levels had been high. (Tr. 1523).

Perry was seen by Dr. Jay Willner, M.D. for an internal medicine examination in May 2014. (Tr. 470-83). Dr. Willner noted that Perry had difficulty walking on her heels and toes due to pain, but that she did not use an assistive device. (Tr. 471). She had a positive straight leg raise 10 degrees bilaterally, but no scoliosis or evident joint deformity. (Tr. 472). Her hand and finger dexterity were intact, her grip strength was 4/5 bilaterally, and she could unzip and zip, unbutton and button, and untie, but was unable to tie. (Id.) Dr. Willner opined that Perry could never lift or carry any weight due to her weak grip; could sit, stand, and walk eight hours in an eight-hour workday; did not require the use of a cane to ambulate; could never handle, finger, feel or push/pull with her hands; could never operate foot controls with her right foot, but could continuously operate them with her left foot; and could never perform any postural activities. (Tr. 474-77). He also opined that Perry could perform activities such as shopping, traveling without a companion, walking a block at a reasonable pace, using public transportation, climbing steps with the use of a handrail, and preparing simple meals. (Tr. 479).

In June of 2014, Perry was diagnosed with diabetic neuropathy. (Tr. 517, 3175, 3162). Her physical examination revealed no joint deformities, effusion or

inflammation, no edema, no clubbing, and no cyanosis. (Tr. 520). It was also noted that Perry walked for exercise. (Tr. 519). Perry was seen by an endocrinologist, who noted her hand and foot pain from her neuropathy. (Tr. 889). A physical exam revealed no pain, redness or swelling on the joints, normal strength in the upper and lower extremities, and a normal gait with no focal motor/sensory deficits. (Tr. 892-93). In August 2014, it was noted that Perry had severe pain in her hands and feet and had lower back pain with spasm. (Tr. 546).

At a consultation for back pain in September 2014, treatment notes indicate that her back pain was worsening, and that she had numbness and pain in her hands and feet. (Tr. 1070). It was noted that Perry's grip strength was 5/5 bilaterally, and her one leg stand was intact. (Tr. 1073). At a follow up visit with her primary care physician, Dr. Rodriguez, in November 2014, Perry complained that her pain was getting worse and that physical therapy was not helping. (Tr. 557). However, a physical examination revealed normal findings, noting no joint deformities or inflammation and mild tenderness in her back. (Tr. 559). In addition, treatment notes from the Interventional Pain Center in November 2014 noted that Perry's back pain was worsening, but that her neuropathy pain was being addressed by medication. (Tr. 1122). A physical exam revealed that her grip strength and plantarflexion were 5/5 bilaterally, and that her one leg stand was intact. (Tr. 1124).

At a visit to her podiatrist in December 2014, Perry was given information about diabetic footwear and was made aware that she was at high risk for diabetic foot complications. (Tr. 1160, 3100). Also in December 2014, Perry was seen at the Interventional Pain Center for her lower back pain, where it was noted that she had finished eight weeks of physical therapy with no relief. (Tr. 1180). Perry started receiving injections for her lower back pain. (Tr. 1180, 1218-19, 1265). Treatment notes also indicate that the medications Perry was taking, including Lyrica, had made a difference with respect to the tingling and pain in her feet. (Tr. 3096).

At this same time. Perry began treating with social worker, Tina Knorr, for depression and anxiety. (Tr. 571). It was noted that Perry was experiencing depression due to her back pain and concerns with her diabetes. (Tr. 572). Her behavior was appropriate, her speech was goal-directed, and she was alert and oriented to person, place, time and situation. (Tr. 575). In January 2015, Perry stated that she felt much better after taking a trip to Chicago to see her family. (Tr. 611, 3089). She was experiencing increased energy but was having sleeping problems. (Id.) She stated that she wanted to start walking again for exercise. (Id.) A later progress note indicated that Perry started walking again for exercise but had felt pain and dizziness. (Tr. 3081). Ms. Knorr consulted Dr. Rodriguez, who advised Perry to seek care at an emergency room or an urgent care facility. (Id.)

In February of 2015, at a follow up with Dr. Rodriguez, it was noted that Perry had generalized pain all over her body, mostly on the joint areas, but a physical exam revealed no joint deformities, effusion or inflammation. (Tr. 643). A psychology progress note at this time noted that Perry was walking with a cane that her daughter had purchased for her. (Tr. 632, 3074). However, at a follow up appointment one week later, Perry was walking without a cane and was feeling much better. (Tr. 655, 3067). It was noted that Perry had walked to the appointment. (Id.) At a session two weeks later, Perry reported to be in more pain, and that it was difficult for her to walk. (Tr. 666).

In March of 2015, Dr. Rodriguez prescribed Percocet for Perry's pain to increase functionality. (Tr. 675). Dr. Rodriguez noted that the goal of Perry's next visit was to increase her exercise and activity level. (Id.) A physical exam revealed pain on the costochondral joint, but no joint deformities, effusion or inflammation. (Tr. 680). Perry was also seen at the Kistler Clinic in March 2015 for her diabetes, where it was noted that she had pain in her knee, which made it difficult to walk for exercise. (Tr. 702). These treatment notes also indicated that Perry was independent and did not need assistance with her activities of daily living. (Tr. 703). Notes from the Pain Clinic in March 2015 stated that Perry's injections were not relieving her pain, and an MRI was ordered. (Tr. 1320). However, progress notes from Ms. Knorr

at this time indicated that Perry was in less pain, which led to her feeling less depressed. (Tr. 693).

Perry presented to Rheumatology in April 2015. (Tr. 1340). Treatment notes state that she was experiencing pain in her hands, feet and lower back, as well as swelling in her joints. (Id.) On examination, there was tenderness to palpitation over the MCPs and PIPs on her hands and wrists. (Tr. 1342). She was diagnosed with polyarthritis, and it was noted that there was a concern for inflammatory arthritis in her hands and feet. (Tr. 1343). However, an April 2015 x-ray revealed no radiographic evidence for inflammatory arthritis in her hands or feet. (Tr. 1354). In May 2015, it was noted that Perry had numbness and tingling in her hands and feet. (Tr. 1392). On examination, Perry had joint pain and tenderness over the MCPs and PIPs bilaterally, and as a result, her prednisone prescription was increased. (Tr. 1393-94). It was later noted that the prednisone helped decrease her hand and foot pain, which she rated a 5/10. (Tr. 1406). Indeed, progress notes from Ms. Knorr indicate that she had started on prednisone and that she was feeling alright. (Tr. 730, 3011-12).

Perry saw Dr. Rodriguez in May 2015, and Dr. Rodriguez noted that Perry had severe pain on the bilateral extremities and swollen knees. (Tr. 742). She was diagnosed with polyarthritis. (Id.) Treatment notes indicate that at this time, Perry

had severe neuropathy and leg pain. (Tr. 768, 3006). At a June 2015 Endocrinology appointment, it was noted that Perry had no significant joint or muscle pain, no swelling, and normal sensation bilaterally in her feet. (Tr. 1438, 2979-80). Treatment notes from a June 2015 Podiatry appointment observe that there was no pain, redness or swelling on the joints. (Tr. 1454). However, a June 30, 2015 progress note from Ms. Knorr noted that Perry arrived at her appointment with a cane and was walking slowly, as she was having knee pain and increased pain in her feet. (Tr. 786, 2975). Notes from the Pain Clinic indicate that physical therapy was strongly recommended to Perry at this time. (Tr. 2986).

In July of 2015, a physical exam revealed normal findings, with no pain, redness or swelling on the joints. (Tr. 798, 2973). It was noted that Perry's diabetes was not controlled, her neuropathy was getting worse, and that she had not started physical therapy yet. (Tr. 2970). Perry also presented to the emergency room with chest pain in July, and treatment notes indicate that she had no swelling in her upper or lower extremities, and that her upper extremities were normal. (Tr. 1554). Treatment notes from a Rheumatology appointment indicated that Perry was still experiencing pain in her hands and feet, but her new medication was working, and her pain was 50% better. (Tr. 1509, 1512, 2953). Ms. Knorr's notes from a July 2015 appointment indicated that Perry was experiencing increased depression due to an

increase in her pain. (Tr. 2966). An August 2015 physical exam revealed largely normal findings, with no joint deformities, effusion or inflammation. (Tr. 835). A psychology treatment note indicated that Perry was feeling "a lot better," and that she was managing her pain and had less stressors in her life. (Tr. 2938).

In September 2015, Perry was attending physical therapy, where it was noted that she had neuropathy and back pain and used a cane. (Tr. 2935). She was also being treated with aqua therapy for her back pain. (Tr. 2889, 2913-2922). Progress notes from Ms. Knorr in October 2015 indicated that Perry was still experiencing pain but was just trying to "live with it." (Tr. 1616, 2901). She further indicated that she felt less depressed, and that her medications, aqua therapy, and 30-minute daily walks were keeping her active. (Id.) A Rheumatology appointment in October 2015 revealed that Perry's medications were not helping, and that she was experiencing widespread joint paint and painful muscles. (Tr. 2897). Dr. Cote noted that her pain could be related to fibromyalgia. (Tr. 2899). Treatment notes from December indicate that Perry was responding well to her medications. (Tr. 2872). Perry was referred for an EMG evaluation of her leg pain in January 2016, which revealed no electrophysiologic evidence of polyneuropathy, entrapment neuropathy, or motor axonal loss from lumbar radiculopathy. (Tr. 2859).

Notes from a January 2016 Endocrinology appointment indicate that Perry was still experiencing pain and numbness in her hands and feet. (Tr. 1941). However, a physical examination was largely normal, with no LE edema or cyanosis and no focal motor/sensory deficits. (Tr. 1954). At a follow up with Dr. Rodriguez, it was noted that Perry had tenderness and swelling of PIP and MCP joints, but no edema, clubbing, or cyanosis. (Tr. 1981). Dr. Rodriguez continued her oxycodone prescription for her pain. (Id.) Treatment notes from February 2016 indicated largely normal findings upon physical examination. (Tr. 2009-10). However, Perry resumed psychology sessions with Ms. Knorr after having discontinued this treatment, as she was feeling more hopeless and depressed after having an unfavorable outcome of her first disability hearing. (Tr. 1993). A February 23, 2016 psychology progress note indicated that Perry was struggling to manage her pain, which led to her feeling depressed. (Tr. 2022).

In March 2016, Ms. Knorr noted that Perry was doing better. (Tr. 2032). She had taken a trip with her daughter to see family, she had lost 15 pounds, and she reported that her lower back pain was gone. (Id.) Treatment notes from Dr. Rodriguez indicated largely normal findings on physical examination, with a bilateral latissimus dorsi muscle spasm in her back. (Tr. 2044). Perry was still being prescribed oxycodone for her neuropathy at this time. (Id.) In April 2016, Perry

reported to Ms. Knorr that she was feeling better after having started with an insulin pump for her diabetes. (Tr. 2065). However, treatment notes show that Perry was having increased pain in her feet and achiness since starting with the insulin pump. (Tr. 2075). In May 2016, it was noted that Perry was doing better with the insulin pump, and that her pain medication helped with her activities of daily living, but her pain was worse in her hands and feet. (Tr. 2114). A psychology treatment note indicated that Perry reported increased nerve pain in her hands and feet since starting with the pump, and that she was feeling more depressed. (Tr. 2132). This note also indicated that Perry could no longer hold the cane her daughter had bought her due to her hand pain. (Id.)

In June 2016, it was reported that Perry was experiencing less pain and was using her insulin pump appropriately, which she was very happy with. (Tr. 2172). She had fallen down the stairs a few weeks prior, reportedly due to pain in her foot. (Id.) In July, Perry reported she was happy with her health-related progress with her insulin pump, and that she was walking daily and feeling better. (Tr. 2189). A psychology note indicated that Perry was still experiencing pain but was managing it and trying to walk daily. (Tr. 2198). It was also noted that she was doing better with management of her diabetes. (Id.) However, in August, Perry was hospitalized for seven days after reporting suicidal thoughts due to worsening pain. (Tr. 2207).

At a follow up appointment, she reported feeling much better following her hospitalization, including decreased pain and increased mood. (Tr. 2220, 2237). It was noted that she thought group therapy was helpful while in the hospital, and she was placed in a therapy group. (Tr. 2237).

In September 2016, at a follow up with Dr. Rodriguez, it was noted that Perry still experienced neuropathy, but that it was stable and she was feeling better. (Tr. 2265). Notes from the Kistler Pain Clinic indicate that Perry's pain medication was "extremely effective," and Perry felt that her pain was well-managed. (Tr. 2745). A physical examination noted that she had a normal gait and normal reflexes, no deformities or edema. (Tr. 2744). In November, it was noted that Perry's insulin was not well controlled, and that she had forgotten how to give herself extra insulin as needed, and she was counseled on how to do so. (Tr. 2721-23). Treatment notes from December show that Perry was not recording her food as directed, which was resulting in high blood glucose levels. (Tr. 2700). However, she reported her pain was much better and well managed, despite having difficulty getting her Percocet prescription refilled. (Tr. 2698).

Perry was seen at the Kistler Clinic in January 2017, where a physical examination revealed no pain or swelling on joints, a normal gait, and no joint deformities. (Tr. 2329, 2692-93). However, it was noted that her glucose levels were

not well controlled, and that she was not entering her blood glucose for days at a time. (Tr. 2689). In February, Dr. Rodriguez noted that Perry no longer needed to take oxycodone five times per day because "her chronic pain has actually improved compared to 6 months ago." (Tr. 2373). He also noted that Perry's blood sugar was still not controlled. (Id.) Physical examinations from February and March showed no joint deformities or inflammation. (Tr. 2373, 2378, 2408). She also reported walking more frequently. (Tr. 2654). However, in April, Perry reported that she had to stop walking because of her back pain. (Tr. 2633). A psychology progress note stated that her depression rated a 5/10. (Tr. 3510). In May, Perry's pain had gotten worse, and it was recommended that she complete physical therapy before attempting injections. (Tr. 2529-30).

Treatment notes from July 2017 indicate that Perry was still experiencing pain, and that her diabetes was not well controlled. (Tr. 2589-90, 3538-39). A physical examination revealed that there were no joint deformities or inflammation, and she was advised to continue walking for exercise. (Tr. 2590, 2593). In August, Perry's physical examination revealed largely normal findings, but treatment notes state that her neuropathy pain was worse. (Tr. 3600, 3603).

Perry underwent a mental status evaluation by Charles LaJeunesse, Ph.D. in October of 2017. (Tr. 3527-34). Dr. LaJeunesse noted that Perry had a history of

14

diabetes, back pain, and diabetic polyneuropathy, and that she regularly saw a therapist. (Tr. 3528). A mental status examination revealed coherent and goal-directed thoughts, fluent speech, appropriate affect, and orientation to person, time, and place. (Tr. 3529-30). She could count and do simple calculations and serial 7s from 100. (Tr. 3530). Her insight and judgment were fair. (Id.) It was noted that Perry's daughter did most of the cooking, cleaning and shopping. (Id.) Dr. LaJeunesse diagnosed her with major depressive disorder, panic disorder, and agoraphobia. (Id.) In a medical source statement, Dr. LaJeunesse opined that Perry had marked limitations in understanding, remembering, and carrying out complex instructions and the ability to make judgments on complex work-related decision. (Tr. 3532). He also opined that she had marked limitations in interacting with the public, supervisors, and coworkers and responding to usual work situations and changes in routine work settings. (Tr. 3533). It was noted that Perry panics when she is challenged, and that her daughter does most of her activities of ailing living. (Id.)

In November 2017, Perry followed up with Dr. Rodriguez, who noted that she was in a lot of pain and her depression was worse, but that he could not prescribe her opioids due to new state/federal guidelines. (Tr. 3648). Dr. Rodriguez prescribed other medication, including Ibuprofen, for her neuropathy pain. (Tr. 3652). As for her depression, a treatment note from December 2017 revealed that her depression

had improved since starting back on her medication. (Tr. 4045). In February of 2018, it was noted that Perry had added walking into her routine for activity, and she had walked twice that week. (Tr. 3730). Physical examinations by Dr. Rodriguez in February and April 2018 revealed largely normal findings. (Tr. 3741-42, 3784-85).

In June of 2018, Perry was seen by orthopedics for pain in her left knee. (Tr. 3868). Treatment notes indicate that Perry had a normal gait and did not use any assistive devices. (Id.) On exam, Perry's feet had sensation intact to light touch, but both her right foot was noted to have 5/5 dorsiflexion and 4/5 plantarflexion, and her left foot had 5/5 dorsiflexion and 5/5 plantarflexion. (Id.) Physical therapy was recommended but Perry opted for a home exercise program. (Tr. 3869). Perry also received custom fit bilateral diabetic nerve shoes. (Tr. 3886). In July, Perry was seen by Podiatry and it was noted that she had neuropathy pain with numbness and tingling in her feet. (Tr. 3912). However, treatment notes from this time indicate that she was walking twice a day for exercise. (Tr. 4069). As for her mental health, a progress note from August 2018 indicated that Perry was not complying with her medications. (Tr. 4035).

At a follow up in September 2018, Dr. Rodriguez noted that Perry's pain was still present but that she was feeling much better physically and mentally. (Tr. 4090). These notes indicate that an x-ray showed knee arthritis. (Id.) However, Perry's

physical examination showed no joint deformities, effusion, or inflammation. (Tr. 4094). Treatment notes from the Kistler Clinic revealed that Perry had a normal gait and normal findings upon physical examination. (Tr. 4112). In October, Dr. Rodriguez filled out a medical source statement, in which he opined that Perry suffered from severe neuropathy and depression. (Tr. 4068). He noted that her most severe symptoms were generalized hand and feet pain. (Id.). Notably, however, this medical source statement was not filled out in its entirety, in that several questions were left blank. (Id.) At this time, treatment notes indicated that her depression was being treated effectively with medication. (Tr. 4126).

At a November 2018 Endocrinology appointment, Dr. Sun noted that Perry's glucose levels were fairly well controlled. (Tr. 4151). A physical examination revealed no significant joint or muscle pain and no swelling. (Tr. 4153). A December 2018 x-ray showed deformity of the left index finger and mild osteoarthritis of the index PIP and MCP joints after Perry had slipped and fallen getting into her car. (Tr. 4291). She required a splint for her finger. (Tr. 4295). As for her depression, in February 2019, it was noted that Perry was depressed and noncompliant with her medications. (Tr. 4263). She was noted to have limited insight and fair judgment. (Id.)

## B. **ALJ Decision**

It was against the backdrop of this medical record that a hearing was held on Perry's disability application on May 9, 2019. (Tr. 1655-94).[3] At the hearing, both Perry and a Vocational Expert testified. (Id.). Following this hearing, on September 6, 2019, the ALJ issued a decision denying Perry's application for benefits. (Tr. 1627-47). In that decision, the ALJ first concluded that Perry met the insured status requirements through December 31, 2016, and she had not engaged in gainful activity since November 8, 2013, the amended date of her alleged onset of disability. (Tr. 1633). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Perry suffered from the following severe impairments: degenerative disc disease of the lumbar spine, osteoarthritis, sacroiliitis, polyarthritis, patellofemoral syndrome, diabetes mellitus with diabetic neuropathy, carpal tunnel syndrome, chronic pain syndrome, major depressive disorder, depressive disorder, and generalized anxiety disorder. (Id.) At Step 3, the ALJ determined that Perry did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr.

---

[3] Perry's initial hearing before the ALJ took place on November 10, 2015. (Tr. 1870-99). The ALJ denied Perry's application for benefits, but on November 2, 2018, the district court vacated and remanded the case to the ALJ for reconsideration. (Tr. 1780-1819). Meanwhile, Perry filed a second application for benefits, which was then consolidated with her first application.

1634-37). In this discussion, the ALJ specifically considered Perry's diabetes and diabetic neuropathy under SSR 14-2p and the impact it had on her ambulation. (Tr. 1635). On this score, the ALJ concluded that the medical evidence showed Perry had maintained the ability to ambulate effectively and perform fine and gross movements effectively. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Perry's limitations from her impairments, which stated that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could occasionally balance, stoop, crouch crawl, kneel and climb, but never on ladders ropes or scaffolds. The claimant could occasionally push/pull lower extremities, including foot controls. The claimant could perform frequent fingering and feeling for fine manipulation, and frequent grasping and handling for gross manipulation. The claimant could occasionally push/pull with the upper extremities. The claimant would have to avoid concentrated exposure, defined as frequently throughout the workday, to temperatures of extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases and por ventilation, vibrations and hazards including moving machinery and unprotected heights. The claimant requires the option to sit and stand throughout the workday with each interval being up to a maximum of 30 minutes, but not off-task when transferring. The claimant could perform simple/routine tasks and detailed tasks, but no complex tasks.

(Tr. 1637).

In reaching this RFC determination for Perry, the ALJ considered Perry's reported symptoms and the objective medical evidence in the record. Perry testified

19

at the administrative hearing. (Tr. 1657-94). She testified that she could not work due to her diabetes, neuropathy, lower back pain, arthritis, and depression. (Tr. 1661). She stated that her daughter did the shopping, cooking, and cleaning because she could not stand for long periods of time or hold anything in her hands for too long. (Tr. 1662). She also testified that she did not exercise. (Id.) She stated that she was able to use a tablet to read books and watch movies. (Tr. 1662-63). Perry also reported being able to walk "maybe a mile" before she would have to stop and take a break, but she had walked 35 minutes to her attorney's office the day before the hearing. (Tr. 1664-65). She stated that her feet sometimes lost feeling while walking, but that she had been prescribed special shoes by her podiatrist. (Tr. 1666). She further reported that she had fallen down the stairs several times due to the pain in her feet, and that her physician advised her not to drive a car. (Tr. 1674-75).

Perry testified about the medications she was taking for her pain, as well as her insulin pump for her diabetes. (Tr. 1667-70). She further testified that she had poor eyesight, and that she had to make the font on her tablet extra-large so that she could read. (Tr. 1670-71). Perry reported that her chronic pain was what contributed in large part to her depression. (Tr. 1672). She also testified that she was having trouble financially, and that her daughter was helping her with finances. (Tr. 1677).

The ALJ considered Perry's statements, but ultimately found that they were inconsistent with the objective medical evidence of record. (Tr. 1638). The ALJ reasoned that although Perry had chronic back pain, the evidence between 2013 and 2019 revealed that her pain was being managed effectively with medication. (Tr. 1638-40). On this score, it was noted that Perry's physical examinations revealed largely normal findings, with no joint deformities, effusion, inflammation or edema. (Id.) Perry treated her pain with anti-inflammatories, muscle relaxants, and injection therapy. (Id.) The medical evidence also established that Perry walked for exercise, and at one time reported walking 5 miles per day. (Tr. 1639). The ALJ also noted Perry's noncompliance with recommended physical therapy in 2015. (Id.)

The ALJ did note Perry's increased pain when she began using her insulin pump in 2016. (Id.) However, Perry reported that she was very happy with her health progress related to the pump, and that her pain medication was extremely effective. (Id.) While she reported increased pain in 2017, treatment notes indicated that her examinations revealed no abnormalities in the extremities and no specific neurological findings, but she was continued to be prescribed narcotics for her lower back pain. (Id.) In addition, treatment notes from 2018 indicated that Perry had a normal gait and did not use any assistive devices. (Tr. 1640).

Perry also suffered from neuropathy in her hands and feet as a result of her diabetes. (Id.) However, while treatment notes indicated findings of mild osteoarthritis in the PIP and MCP joints, The ALJ noted that there were no specific abnormal findings related to the extremities. (Id.) Moreover, treatment records showed that the plaintiff's neuropathy was significantly better when her blood glucose was better controlled, and these records indicated that there were several instances in which Perry was counseled on noncompliance with her pump. (Tr. 1640-41). Perry was prescribed narcotics for her neuropathic pain. (Id.) In 2018, she was also prescribed diabetic shoes by her podiatrist. (Tr. 1641). At this time, it was noted that her blood sugars were good overall with only rare lows. (Id.) The ALJ also noted that while Perry's blood glucose contributed to her pain, this was in part due to noncompliance or misunderstanding on Perry's part. (Id.)

Finally, with respect to her physical impairments, the ALJ considered the medical opinion evidence, including the opinion of Dr. Jay Willner, M.D., who performed a physical consultative examination in May 2014. (Tr. 1641). The ALJ afforded Dr. Willner's opinion little weight, reasoning that the opinion was internally inconsistent, in that Dr. Willner did not propose any sitting, standing or walking limitations despite his findings that Perry had difficulty walking on her heels and toes and had a straight leg-raise test. (Id.) In addition, the opinion was

inconsistent in that he proposed absolute limitations on lifting, carrying, and the use of upper extremities despite finding only a slight reduction in Perry's grip strength and finding that she was able to untie, button and unbutton, and zip and unzip. (Id.) The ALJ reasoned that the objective findings of muscle strength and only slight reduction in grip strength were inconsistent with the limitations proposed by Dr. Willner. (Tr. 1642). The ALJ also noted that Dr. Willner's examination was a one-time examination and he did not have a treating relationship with Perry. (Id.)

The ALJ also considered the opinion of Dr. Schaffzin, who performed a state agency physical assessment in September 2017. (Tr. 1645). Dr. Schaffzin opined that Perry could perform a range of light work with some postural and environmental limitations. (Id.) However, the ALJ only gave this opinion some weight, as the RFC she had crafted for the plaintiff provided for greater limitations regarding Perry's upper and lower extremities based on the medical evidence. (Id.) The ALJ also noted that this opinion provided for additional limitations based on a vision exam but concluded that the environmental limitations in the RFC adequately accounted for any limitations from Perry's nonsevere vision impairment. (Id.)

Finally, the ALJ considered a one-page statement from Dr. Rodriguez, the plaintiff's treating physician, in November of 2018. (Tr. 1644). The ALJ gave this statement little weight due to the fact that the statement did not discuss any specific

functional limitations, but rather simply noted the plaintiff's diagnoses, symptoms, and medication side effects. (Id.) Accordingly, the ALJ concluded that this statement was of little evidentiary weight. (Id.)

Thus, as to Perry's physical impairments, the ALJ recognized Perry's chronic back pain, diabetic neuropathy, and knee pain had an impact on her exertional and postural limitations and limited her to light work with a sit/stand option, limited use of the lower extremities, and limited use of her upper extremities due to her neuropathy in her hands. (Id.) Ultimately, the ALJ explained that while the record did indicate that the plaintiff had limitations from her impairments, the medical evidence was not consistent with a greater level of limitation as alleged by Perry. (Id.)

As for the evidence related to Perry's mental health, the ALJ considered evidence of Perry's treatment for depression and anxiety. On this score, the ALJ noted that Perry began outpatient treatment for depression and anxiety in 2014. (Tr. 1642). The ALJ recognized that throughout the relevant time period, treatment notes indicated that Perry's symptoms largely fluctuated in relation to her pain levels. (Id.) For example, in February 2015, the plaintiff reported improvement in her pain and reported that she had walked to her appointment. (Id.) However, it was noted that the plaintiff's depression worsened in 2016, and that she was hospitalized in August

2016 for one week due to suicidal thoughts. (Tr. 1643). The ALJ noted that treatment records from 2017 and 2018 varied, but that the findings on examination showed linear thought process and fair judgment, and that her depression was related to her chronic pain. (Id.)

In addition to the mental health treatment records, the ALJ considered the opinion of Charles LaJeunesse, Ph.D., who performed a mental consultative examination in October 2017. (Id.) The ALJ gave this opinion partial weight. (Id.) As to the findings of mild limitations with simple instructions and work-related decisions, the ALJ gave these findings great weight, reasoning that they were consistent with treatment records that showed objective clinical findings of fair judgment and linear thought process. (Tr. 1643-44). However, as to the marked limitations with complex instructions, work related decisions, and interaction with supervisors, coworkers and the public, the ALJ gave these findings little weight. (Id.) On this score, the ALJ reasoned that these findings were inconsistent with the objective clinical evidence that showed coherent and logical thought, fair judgment, and no deficits in attention or concentration. (Tr. 1644). The ALJ also noted that the marked impairments were inconsistent with the claimant's conservative treatment and no more than a mild limitation assessment from her treating provider. (Id.)

Finally, the ALJ stated that this was a one-time examination, which was based largely on the subjective complaints of the claimant.

The ALJ also considered the opinion of Shelly Ross, Ph.D., who performed a state agency mental assessment in October 2017. (Tr. 1645). The ALJ gave some weight to the findings of reduced level of tasks, but partial weight to the opinion that Perry could only perform one to two step tasks. (Id.) The ALJ reasoned that this limitation was inconsistent with findings that showed coherent and goal-directed thought processes and Perry's ability to count, do simple calculations and perform serial 7s from 100. (Id.)

At Step 4, the ALJ found that Perry was unable to perform her past relevant work as a home health aide, but found at Step 5 that there were jobs in the national economy that Perry could perform, including toll collector, general cashier-parking lot, and cashier-amusement/box office. (Tr. 1646-47). The impartial Vocational Expert testified Perry could perform these jobs with the limitations provided by the ALJ's RFC assessment. (Tr. 1683). Thus, the ALJ found that Perry was not disabled and denied her application for benefits. (Tr. 1647).

This appeal followed. (Doc. 1). On appeal, Perry contends that the ALJ's decision is not based on substantial evidence required under 42 U.S.C. § 405(g) because: (1) the ALJ erred in assessing the medical and opinion evidence, and (2)

the ALJ failed to adequately consider the plaintiff's subjective complaints of pain and limitations. Specifically, Perry argues that the ALJ misstated the medical evidence and substituted her own opinion for the medical opinions in the record. Moreover, Perry alleges that the ALJ failed to properly credit her subjective complaints.

This case is fully briefed and is, therefore, ripe for resolution. For her part Perry advances her claim that this decision rests upon an unfairly selective reading of the record with great skill and passion, but we are constrained by both the deferential standard of review and the conflicting nature of the medical evidence to disagree. Accordingly, for the reasons set forth below, under the deferential standard of review that applies here, the Commissioner's final decision will be affirmed.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis

deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must

not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.**     <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an

assessment from a physician regarding the functional abilities of the claimant."
Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)
(quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa.
Mar. 4, 2013)). In other instances, it has been held that: "There is no legal
requirement that a physician have made the particular findings that an ALJ adopts
in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11
(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any
credible medical opinion supporting a claimant's allegations of disability that "the
proposition that an ALJ must always base his RFC on a medical opinion from a
physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D.
Pa. 2015).

These seemingly discordant legal propositions can be reconciled by
evaluation of the factual context of these decisions. Those cases which emphasize
the importance of medical opinion support for an RFC assessment typically arise in
the factual setting where a well-supported medical source has opined regarding
limitations which would support a disability claim, but an ALJ has rejected the
medical opinion which supported a disability determination based upon a lay
assessment of other evidence. In this setting, these cases simply restate the
commonplace idea that medical opinions are entitled to careful consideration when

making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064.  Once

this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinions

In this case, Perry initially filed for application for disability benefits in April of 2014 and then filed again in May of 2017 shortly after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. The regulations which pre-dated March of 2017 also set standards for the evaluation of medical evidence and defined medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the plaintiff's] impairments, including [the plaintiff's] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairments, and [the plaintiff's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Regardless of its source, the ALJ was required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c).

In deciding what weight to accord to competing medical opinions and evidence, the ALJ was guided by factors outlined in 20 C.F.R. § 404.1527(c). "The regulations provide[d] progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources had the closest ties to the claimant,

and therefore their opinions were generally entitled to more weight. See 20 C.F.R. §
404.1527(c)(2) ("Generally, we give more weight to opinions from your treating
sources..."); 20 C.F.R. § 404.1502 (defining treating source). Under some
circumstances, the medical opinion of a treating source may even be entitled to
controlling weight. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 WL
374188 (explaining that controlling weight may be given to a treating source's
medical opinion only where it is well-supported by medically acceptable clinical and
laboratory diagnostic techniques, and it is not inconsistent with the other substantial
evidence in the case record).

Where no medical source opinion was entitled to controlling weight, the
Commissioner's regulations directed the ALJ to consider the following factors,
where applicable, in deciding the weight given to any non-controlling medical
opinions: length of the treatment relationship and frequency of examination; nature
and extent of the treatment relationship; the extent to which the source presented
relevant evidence to support his or her medical opinion, and the extent to which the
basis for the source's conclusions were explained; the extent to which the source's
opinion is consistent with the record as a whole; whether the source is a specialist;
and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

However, in March 0f 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to

"supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id</u>. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id</u>. at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

Judicial review of this aspect of ALJ decision-making is still guided by several

settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency

consultants – must make the ultimate disability and RFC determinations." <u>Chandler</u>

<u>v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d

Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

It is against these legal benchmarks that we assess the instant appeal.[4]

---

[4] We note that Perry's case spanned this regulatory change with her initial application filed before March 2017 and her second application submitted after March 2017. However, upon consideration we conclude that this shifting analytical paradigm does not alter our analysis. Under either set oof regulatory rules, we conclude that

## D. **The ALJ's Decision in this Case is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Perry was not disabled. Therefore, we will affirm this decision.

Perry first argues that the ALJ erred in her evaluation of the medical evidence and opinion evidence. Specifically, Perry claims that the ALJ misstated some of the evidence, was selective in the evidence that she relied upon to make her determination, and discounted the medical opinion evidence and substituted her own opinion. At the outset, while the plaintiff makes much of the fact that the ALJ seemingly omits specific, important pieces of evidence from the decision, we note

there was adequate evidence in this expansive but equivocal record to sustain the ALJ's decision.

that the record before the ALJ—and the record before this court—consists of over 4,000 pages of material including medical records, medical opinions, and other documents related to the application for benefits. Accordingly, as a matter of common sense, it would be entirely impractical for the ALJ to list every single piece of evidence in her written decision denying the plaintiff's application for benefits.

Moreover, the ALJ is not required to list every piece of evidence in the record in her decision. Indeed, as the Third Circuit has stated, "we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). Rather, as we have explained, the ALJ must consider all of the relevant evidence and make the ultimate determination of whether the plaintiff is disabled, giving an adequate explanation for why she credited some evidence and rejected others.

In this case, we find that the ALJ did just that when addressing what was an expansive but equivocal medical record. As we have stated, the ALJ was not required to discuss every piece of evidence in the voluminous record. However, the ALJ did discuss Perry's treatment for both her physical and mental impairments. On this score, as extensively outlined above, the ALJ discussed the claimant's treatment for back pain, noting that while the treatment records indicated Perry suffered from

chronic back pain, her pain was managed with anti-inflammatories, narcotics, and injection therapy. The ALJ also noted that there were times where Perry was noncompliant with treatment, such as in 2015 when she had failed to start her recommended physical therapy. The ALJ further discussed that Perry was treated for depression, which was due in part to her chronic pain, but explained that treatment notes indicated that she mostly had fair judgment and coherent and linear thoughts, and that her depression was better when her pain was well-managed.

The ALJ also considered Perry's diabetic neuropathy, which treatment notes indicated was due, in part, to the plaintiff's diabetes being poorly managed. Further, the treatment notes showed that Perry's diabetes was not well-managed at times because of her noncompliance or confusion regarding her insulin pump. In addition, contrary to the plaintiff's contention, the ALJ specifically considered SSR 14-2p when discussing Perry's diabetic neuropathy. The ALJ explained that she considered the effects of the plaintiff's neuropathy on her ability to ambulate, but ultimately concluded that based on the objective medical evidence, Perry had maintained the ability to ambulate effectively and perform fine and gross movements effectively. The ALJ discussed how there were periods of time that the plaintiff's pain increased, but overall noted that treatment notes indicated her pain and depression was being managed effectively.

In addition, the ALJ adequately explained the weight given to the various medical opinions in the record, and she explained how those opinions factored into her RFC determination in light of the objective medical evidence. On this score, we note that the question of disability is a legal determination and is not wholly dictated by medical opinions. Thus, "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455.

Here, the ALJ adequately discussed all of the medical opinions in the record and explained the weight given to each. The ALJ considered Dr. Willner's May 2014 consultative examination but gave it little weight and concluded that it was internally inconsistent, in that the opinion noted only a slight reduction in grip strength but opined that Perry could not use her upper extremities whatsoever. The opinion also noted that Perry had diminished sensation in her foot, but did not limit her standing or walking. The ALJ considered the 2018 statement from the plaintiff's treating physician, Dr. Rodriguez, but she concluded that it had little evidentiary weight due to the fact that no specific functional limitations were noted. As for Dr. Schaffzin's state agency assessment, the ALJ gave this opinion little weight because the RFC

provided greater limitations than opined by Dr. Schaffzin with the exception of his limitations regarding Perry's visual impairments. On this score, the ALJ explained that the RFC's environmental limitations would account for Perry's nonsevere vision impairment.

The ALJ also considered the medical opinions regarding the plaintiff's mental impairments. The ALJ gave partial weight to Dr. LaJeunesse's October 2017 consultative examination, reasoning that the mild limitations were consistent with the record evidence, but the marked limitations were not consistent, based on objective findings in the record from Perry's treating provider. The ALJ also considered the state agency mental assessment performed by Dr. Ross in October 2017. The ALJ afforded this opinion some weight, in that the reduction in level of tasks was consistent with the medical evidence. However, the ALJ concluded that the remainder of Dr. Ross' opinion was inconsistent with objective findings of coherent and goal-directed thoughts, the ability to count, do simple calculations, and perform serial 7s from 100.

Finally, the ALJ considered Perry's subjective complaints regarding her pain and depression, but ultimately concluded that Perry's statements were not entirely consistent with the medical evidence. On this score, while Perry testified that she hand burning pain in her hands and feet, and that she laid in bed 90% of the day, the

ALJ noted that the treatment records indicated Perry's pain was managed by narcotics and injections. The ALJ also recognized that the treatment notes over the almost six-year period of alleged disability indicated that Perry walked for exercise, and at one point, reported that she was walking five miles per day. Perry had also testified that she walked to her attorney's office the day before the hearing. While Perry stated that she used a cane, and the ALJ noted a few records that indicated Perry at one point used a cane that her daughter purchased for her, the ALJ pointed to several treatment notes over the time period that noted no use of an assistive device, including treatment notes from as recent as 2018.

As for her depression and anxiety, while Perry testified that she did not do many activities and that her daughter did most of the shopping and household chores, the ALJ noted that Perry was able to use public transportation and visit her daughter on weekends. Perry testified that she used a tablet to read books and listen to music. The ALJ also pointed to treatment notes indicating that Perry took several trips to visit family, including trips to Chicago and North Carolina. Moreover, the ALJ noted that Perry's depression was related to her chronic pain, but that there were periods of noncompliance with her insulin pump and physical therapy. Psychology treatment notes indicated that Perry's depression was, in part, due to her chronic pain, which included neuropathic pain. However, the treatment notes indicated that Perry

experienced less pain when she was compliant with her insulin pump, and that less pain led to less depression. Accordingly, the ALJ credited Perry's subjective complaints to an extent, but ultimately concluded that they were not entirely consistent with the objective medical evidence.

In sum, the ALJ was confronted by several medical opinions, which including varying limitations based on the plaintiff's physical and mental impairments. The ALJ considered all of these opinions against the objective medical evidence in the record and explained why some weight was given to certain opinions and why she found the other aspects of the opinions inconsistent with the medical evidence. The ALJ further considered the plaintiff's subjective complaints against the objective medical evidence and concluded that the evidence was not consistent with Perry's alleged level of limitation. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Accordingly, under the deferential standard of review we must apply we find that the ALJ sufficiently considered all of the medical evidence and the plaintiff's subjective complaints and adequately explained her reasoning for the weight given to the various medical opinions in this case to determine the range of light work Perry could perform.

On the facts as outlined above, the ALJ found that Perry had not met the stringent standard for disability set by law. It is the right and responsibility of the ALJ to make such assessments and we find that substantial evidence supported the ALJ's decision in the instant case. Thus, at bottom, it appears that Perry is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Because we cannot re-weigh the evidence, and because we find that the ALJ sufficiently articulated that substantial evidence did not support this disability claim, we will affirm the ALJ's decision in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence, a term of art which means less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the plaintiff's skillful argument that this evidence might have been

viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV. <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

April 29, 2021